(December 3, 2015)

■ Sonero Pichardo, as Guardian of Lequina Pichardo, Respondent, v St. Barnabas Nursing Home, Inc., et al., Appellants. [21 NYS3d 42]—

Order, Supreme Court, Bronx County (Stanley Green, J.), entered on or about March 3, 2015, which denied the motion of defendants St. Barnabas Nursing Home, Inc. and St. Barnabas Hospital for summary judgment dismissing the complaint, unanimously affirmed, without costs.

Plaintiff's decedent was admitted to St. Barnabas Hospital on February 10, 2009, complaining of abdominal pain and vomiting. Decedent, 81 years old at the time, suffered from multiple conditions including dementia, gastroenteritis, and heart disease. She was diagnosed with acute pancreatitis, anemia, hypoalbuminemia, pneumonia, and acute respiratory failure, and placed on a ventilator. During the hospital admission, decedent developed a stage II sacral ulcer measuring 11 by 10 centimeters.

Decedent was transferred to St. Barnabas Nursing Home on March 6, 2009, but had to be readmitted three days later. Upon readmission, she was found to have, inter alia, a perforated stomach, an inflamed gallbladder, peritonitis and pancreatitis. She remained in the hospital until April 27, 2009. The sacral sore was treated with Multidex gel and the dressing changed every two days. During the admission, the sore decreased in size to 3.5 by 2 centimeters.

Plaintiff's decedent was transferred back to the nursing home on April 27, 2009. The transfer sheet indicated that the same treatment for the ulcer was to be followed, i.e., Multidex gel with dressing change every two days.

By June 4, 2009, the size of the sacral ulcer had increased to 6 by 10 centimeters with eschar, or dead tissue, indicating to plaintiff's expert that the sore had progressed to a more advanced stage.

Decedent was transferred back to the hospital on July 14, 2009 in septic shock with an elevated temperature and low blood pressure. The transfer sheet indicated that the sacral ulcer was still stage II. However, the hospital's note described it as a stage IV exuding ulcer. The chart noted two additional ulcers on the left and right buttocks that had not been documented in the nursing home's chart.

Plaintiff's decedent was readmitted to the nursing home on August 31, 2009. She remained incontinent and ventilator-dependent, ultimately dying on June 17, 2013.

Plaintiff commenced this action alleging medical malpractice, negligence, and violation of Public Health Law § 2801-d, premised upon defendants' failure to prevent and to halt the progression of decedent's pressure ulcers.

Defendants moved for summary judgment dismissing the complaint, asserting that decedent's ulcers were unavoidable based on her comorbidities and deteriorating health. Defendants' expert geriatrician, Dr. Levine, opined that decedent's skin ulcers were a consequence of hypoperfusion to the organs resulting from longstanding complications and illnesses, including dementia, hypertension, hypercholesterolemia, gastroenteritis, and heart disease, among others. Dr. Levine opined that "the synergistic effect of her multiple comorbidities" together with acute illness caused a state of "systemic inflammation" and multiple organ failure. Because of her immobile condition, decedent was not amenable to the usual range of turning and positioning. Tube feedings necessitated that her head be elevated, causing increased pressure and shear forces to the sacral area. Dr. Levine opined that whenever a person with severe preexisting illnesses experiences acute illness necessitating prolonged intensive care and artificial life support, the risks for further adverse outcomes like worsening wounds, ventilator associated pneumonia and sepsis is increased, even with the best of care.

Plaintiff opposed the motion, relying, inter alia, on the affidavit of Dr. Khimani, his expert geriatrician. Dr. Khimani opined that the hospital's departures from good and accepted medical and nursing practices caused decedent to develop a stage II sacral pressure ulcer during the hospital admission commencing February 9, 2009. Dr. Khimani noted that

decedent was not turned and positioned every two hours to avoid skin breakdown; thus, it could not be said that the sacral ulcer was "unavoidable." He noted that while patients on ventilators pose "more of a challenge in off-loading pressure," pillows, wedges and other devices may be used as positioning aids. The fact that the ulcer improved during the hospital admission commencing March 9, 2009, in Dr. Khimani's view, also belied defendant's claim that formation of ulcers was unavoidable.

Dr. Khimani opined that the nursing home's departures from good and accepted medical practice resulted in significant deterioration of the sacral bedsore and formation of additional bedsores. He opined that the nursing home should have continued the hospital's treatment protocol of changing the dressing every two days, explaining that changing the dressing daily peeled away developing skin and hindered healing. He opined that it was a departure not to provide passive range of motion in the lower extremities, noting that passive ROM therapy helps to improve circulation and thereby promote wound healing. He opined that it was a departure not to change the staging of the ulcer or the treatment plan after the ulcer had increased in size to 6 by 10 centimeters and had eschar.

Dr. Khimani noted that upon decedent's admission to the hospital on July 14, 2009, the sacral ulcer was described as a stage IV draining ulcer necessitating surgical debridement. He noted that hospital staff failed to document that decedent was receiving the necessary daily treatment to heal the ulcer and prevent it from worsening.

Dr. Khimani took issue with Dr. Levine's opinion that the skin ulcers were unavoidable, stating "it [wa]s clear" from the hospital and nursing home records that the standards with respect to skin care were not met, noting the lack of assessment and documentation regarding positioning, turning, etc. While decedent's comorbidities increased the risk of developing skin ulcers, Dr. Khimani opined that her illnesses alone had not caused the ulcers.

In reply, Dr. Levine opined that the frequency of dressing change would not have led to wound deterioration, asserting that Covaderm and Multidex gel are inert polymers with no pharmacological effect upon the wound. He disagreed with Dr. Khimani's opinion that the development of eschar renders a sore stage IV, explaining that a sore with eschar is unstageable because the base of the wound cannot be visualized. He

maintained that decedent was turned and positioned* and that staff performed passive range of motion, although he did not discuss the frequency of any such treatments.

The motion court denied defendants' motion for summary judgment, finding questions of fact with respect to whether defendants had properly treated decedent; whether they had allowed the ulcers to develop, or failed to properly treat them; and whether the ulcers were avoidable based on decedent's comorbidities.

As an initial matter, we find that both defendants' and plaintiff's experts were competent to render their opinions. As a specialist in geriatrics, Dr. Khimani treated injuries of the elderly, including skin ulcers (see Hranek v United Methodist Homes of Wyo. Conference, 27 AD3d 879, 880 [3d Dept 2006]). Plaintiff failed to preserve his objection to Dr. Levine's qualifications by raising it before the motion court. Dr. Levine, as a specialist in geriatrics and wound care, was in any event qualified to render an opinion as to the standard of care for skin ulcers.

Defendants established a prima facie case of entitlement to summary judgment via medical records and the affirmation of Dr. Levine, who explained that decedent's treatment was in accordance with good and accepted medical practice and was not a proximate cause of her injury, explaining that given her comorbidities the formation and worsening of skin ulcers was unavoidable (see Negron v St. Barnabas Nursing Home, 105 AD3d 501 [1st Dept 2013]).

In opposition, plaintiff raised a triable issue of fact with respect to whether defendants departed from good and accepted medical practice. Dr. Khimani asserted that defendants' failure to turn and position decedent every two hours and to perform passive range of motion exercises contributed to the formation and worsening of the skin ulcers, taking direct issue with Dr. Levine's conclusion that formation of skin ulcers was "unavoidable" given decedent's comorbidities. He also opined that the nursing home's failure to adhere to the hospital's wound care

---

* The nursing home records attached to Dr. Levine's reply affidavit indicate that decedent was turned and positioned every two hours during the nursing home admission from April 27, 2009 through July 14, 2009. The records for the first hospital admission (Feb. 9 through Mar. 6, 2009), indicate that a turning and positioning protocol was in place once decedent was transferred to the floor, on February 26, 2009, but does not indicate the frequency of any such turning or positioning. Turning and positioning sheets were not kept during decedent's stay in the ICU (Feb. 9 through Feb. 26, 2009). Dr. Levine maintained, however, that ICU nurses would have turned and positioned decedent as part of their duties.

plan resulted in the worsening of the sacral sore, and that the failure to adjust the treatment plan when the sore increased in size and developed eschar was a departure. While decedent's comorbidities played an obvious role in her decline, it cannot be said that formation and worsening of skin ulcers was unavoidable as a matter of law. The affirmation of plaintiff's expert, while "sparse," was based on a review of the medical records and adequately sets forth the claim by factual references to decedent's care and treatment (*see Bell v Ellis Hosp.*, 50 AD3d 1240 [3d Dept 2008]).

Dr. Levine opined that defendant nursing home was "in compliance with applicable statutory regulations," but did not opine as to the specific regulations set forth in plaintiff's bill of particulars (*compare Gold v Park Ave. Extended Care Ctr. Corp.*, 90 AD3d 833, 834 [2d Dept 2011]). In any event, plaintiff in opposition raises triable questions of fact as to whether defendant nursing home violated Public Health Law § 2801-d (1). Concur—Gonzalez, P.J., Sweeny, Manzanet-Daniels and Kapnick, JJ.

